I don't have any problem with your argument that when a person consults an attorney with the possibility of retaining the attorney, the matter is confidential even if the attorney is not retained regardless of whether the attorney is retained. I don't have any problem with that. My problem is whether, and I don't have any problem with your point that the matter is confidential or a way of confidentiality. It doesn't mention that. So far, I'm with you. We don't consult before the argument, so I don't know what my colleagues think. My problem with it is I can't tell whether when somebody fills this thing out on the Internet, they're talking to the lawyers with contemplation of retaining the lawyers. It could be that or it could be that they're just filling out a questionnaire in order to provide data for some sort of survey of Paxil users. And it says the purpose of the questionnaire is to gather information. It doesn't say so that we can consider accepting you as a client or something like that. Why? I know it's described in your arguments as a, I can't remember your word, but basically a form that the lawyers use to have clients apply to them to be represented, but it doesn't say that. Intake questionnaire. Intake questionnaire. It doesn't say that. So why should we view it that way? Thank you for your question, Justice Kleinfeld. I would like to address it on two points. First, the district court clearly found in her order after reviewing all the materials submitted that, in fact, these petitioners were seeking legal representation at the time they filled out these questionnaires. Are we bound by that? I mean, we're being asked for a mandamus. Can we pick and choose and say we're going to accept this part and it follows from that that we're going to grant a mandamus and overturn her? Well, I do believe that that was a factual finding the district court made. But what I would tell you in response to that, Your Honor, is that, in fact, the district court made the distinction that the speedy oil court made, which was the distinction between initial and peripheral contacts, on the one hand, which aren't protected by the preliminary communication privilege, and more substantial contacts, which occurred here. My distinction was different. I was thinking, suppose I'm representing somebody in an intersection collision against the highway department. Maybe I want to do a survey of local drivers so that a whole bunch of them will say, oh, that's a terrible intersection. I've had an accident there. I didn't report it. It was just a fender bender, so that I can prove that the highway department should have done something about the intersection. To me, this looks like it could be just information gathering. Well, I think there's an important distinction between your hypothetical and what occurred here. And I think that the important consideration is from the client's perspective. What was the client doing at the time they sent this questionnaire? We know that these clients or these potential clients at the time, who are now clients of counsel, had a specific claim against a specific defendant for which there was already existing litigation. These petitioners sent How do I know from this questionnaire that they did on the Internet that they were trying to be the firm's clients? Can you repeat your question? I'm sorry. How can I tell from this questionnaire they filled out on the Internet that they were trying to be the firm's clients? Well, I think that the important thing is not that they were trying to be the firm's clients, but that they were seeking legal representation just as a result. How can I tell that they were? And I think that the way you can tell that is by the context of what was going on. Again, these were people with specific claims submitting this information to attorneys who were already prosecuting litigation against this defendant. I have two issues with that characterization, and I'd like you to respond to these two issues. The first is at page 252 of the record. I'm not sure how this ‑‑ there are several paginations. It's Exhibit A, page 33, towards the end of the questionnaire, where the person says, I agree, the above does not constitute a request for legal advice, and that I'm not forming an attorney-client relationship. You don't have to form the relationship, but they're also specifically saying they're not requesting legal advice. That's the first thing that concerns me. The second is that on the first page of the questionnaire, it invites people to fill out the form if a loved one has been adversely affected, where it's even a third party. It's not even them seeking something about themselves. It's just contacting, well, maybe my brother or my cousin or somebody has had this problem, and I'm interested in following up on it. Where they wouldn't even have the right to form an attorney-client relationship on behalf of another competent adult. Those are the two pieces of the questionnaire that concern me. Thank you for your question, Justice Graber. I'd like to address those in reverse order, if that's okay with you. He used to be Justice Graber. I got demoted. Oh, okay. He was on the Oregon Supreme Court. Oh, I apologize. As anyone will tell you, there's no justice with the night circuit. Okay. Well, I hope you'll grant me some leeway. This is my first argument in front of the night circuit this morning. No, I'm fine. Thank you, Judge Graber. And again, I would like to address these in reverse order. First, someone is allowed, and in fact, this happened with one of the petitioners, Petitioner Barton. Someone is allowed to engage a third party to assist them in attorney-client communications, as long as it's for the purpose of seeking and obtaining legal representation. In fact, I think that that's codified in the California Evidence Code at Section 915. So it's not 100% required that only the client communicate with the attorney. A client can associate a third party to communicate with the attorney, as long as the purpose of that communication is to seek legal advice. Which takes me to the question where they say, I'm not asking for legal advice. Yeah, and that's what I want to address here as the second point, Judge Graber. In fact, there's a difference between requesting legal advice and seeking legal representation. For instance, there was hundreds and thousands of these questioners that were submitted to counsel. These were people that clearly were, you know, counsel didn't reach out to them. They reached out to counsel through this Internet website. The difference between seeking legal representation and agreeing not to request legal advice is something very tangible and important to this case. If counsel didn't have this disclaimer, then it would create a situation where when this submission was sent to counsel, there would have to be a quid pro quo, meaning I'm going to send you my material, confidential medical information, and in exchange you have to give me legal advice. In fact, under the Speedy Oil case, the rendering of legal advice is what creates the attorney-client relationship, which triggers all the duties of loyalty and client loyalty and also triggers potential malpractice liabilities. What was the, can I ask, you know, this was a lawyer-designed form, correct? First of all, I have a technical question. This thing that appears where it says, yes, I agree, this does not constitute, it's got a checkbox next to it and then an asterisk. Normally in the computer world, that means that that has to be checked or the form won't go to your firm, right? I believe that's true. What was the purpose of that paragraph from the law firm's point of view? I think the purpose of this paragraph is twofold, Judge Hawkins. First, I think it protects the attorneys, and to be quite frank with you, we were concerned at the time about statute of limitations issues. Before this questionnaire went up on the website, we were inundated with hundreds of telephone calls from people who had these types of claims. We were concerned that we weren't going to be able to respond back to these people in sufficient time to protect them in case they had some statute of limitations problems. So I think the purpose of this is twofold. First, to be clear that there's no attorney-client relationship that's formed, which would put counsel in a position where they're liable for possible statute of limitations problems in the timely manner. The second part is I think it protects the client's expectations. These clients needed to know that they weren't hiring an attorney at the time they submitted this information so they wouldn't sleep on their rights, so that they would go out and seek other counsel unless they heard back from the law firm. Does the form anywhere say that the information conveyed is confidential? No. In fact, it doesn't mention confidentiality once, and that was the error with the district court's order. In California, it's presumed that communications between clients and attorneys are confidential. It wasn't necessary that this questionnaire or this disclaimer explicitly state that the information would be kept confidential. And I want to point to some of the information the district court had in front of her when she made her ruling. In fact, this questionnaire asked for very personal medical information. For instance, it asked if the potential client submitting it had a suicide attempt or suicidal behavior. It asked whether the potential client experienced any miscarriages. It asked for the mental health history, including... Let me ask you about that. When a confidential communication is made to a lawyer, and it's covered by the privilege, it's a two-way street. The lawyer can't make a disclosure. So if somebody came into my law office and said, I want to get a divorce, and I'll tell you all these terrible things my husband has done and that we've done, and the issues in custody, and I say, look, I don't do divorces. I haven't done divorces in years. I don't want your case. I'm not going to represent you. It's still confidential. I can't tell anyone. That's correct. Personal stuff, just like this. Now, did the lawyers receiving the questionnaire accept it as binding upon them that it was secret? Or have they felt free to disclose it to expert witnesses, to other lawyers that they might subcontract the cases out to without the express consent of the client in the individual case? Absolutely, Your Honor. This information was protected as privileged information. It may have been disclosed at some point in time during the litigation to people that were within the sphere of the privilege. For instance, co-counsel in the litigation who are within the sphere of the privilege, or in some cases, and there's an important distinction, I think, that's embedded within your question, Judge Kleinfeld. In fact, this asks for a lot of factual information. GSK, through the course of discovery, was able to discover much or all of this factual information under oath through interrogatories and depositions. That information that was learned through discovery was transmitted to the experts in order for the experts to evaluate the case. That actually was going to be my question in part. Once someone decides to become a client or a plaintiff in this litigation and makes a decision to purchase a drug, their medical history becomes relevant and becomes discoverable by virtue of the fact that they have brought the lawsuit. And I understand that there's, you know, a principle involved, but I'm not sure what it is that's being protected that's different from what is already known about each of these individuals, because all of this information would, it seemed to me, be discoverable about each of the plaintiffs anyway. I think that's an important question, Judge Graber. And in fact, the California Supreme Court has dealt with that precise question in Mitchell v. Superior Court. In the Mitchell case, the California Supreme Court said that factual information, not just legal information or legal advice, but factual information, which was transmitted from the potential client to the attorney during the course of that initial consultation, is protected to the same extent as anything else. There's no distinction made in California between that factual information and any other information the client might transmit. And I think that this is an important distinction, because GSK ---- So this is kind of a theoretical fight, because presumably they already have all of this factual information about all of these people, but you don't want them to see it in this form. I mean, everybody's doing this. It seems like a very theoretical fight. Correct. In fact, what GSK indicated in their papers is that the purpose of this information to the drug company is to test these petitioners' credibility. They believe that, in fact, these responses that the petitioners gave at an earlier stage in the litigation might reveal some inconsistencies. But they're not arguing at all that, in fact, they're going to learn some new information through these questionnaires. They have the questions that were asked in the questionnaire, because they were provided with all of this information at a prior time in the litigation. And, in fact, during the course of the deposition of these five petitioners ---- So both sides are basically either looking for or protecting against prior inconsistent statements. That's basically what this is about. I think it's more than that, Your Honor. I think what petitioners are arguing is that their fundamental right to an attorney-client privilege or confidential information they gave to their attorneys is absolutely protected from disclosure. This isn't some sort of hypothetical exercise. This is an important attorney-client issue that these petitioners are asserting here, Your Honor. And, in fact, I think the district court sort of almost cavalierly disregarded this fundamental rule in American jurisprudence. Let me see if I understand what you just said. The defendants can and perhaps have, in an interrogatory, sent this questionnaire to every plaintiff and gotten the plaintiff's responses to the identical questions, perhaps the identical questionnaire. And the issue in this case is whether they can get the responses that the clients made to the identical questionnaire on the Internet to see if they were inconsistent. I would like to answer your question, Justice Kleinfeld, and make that my last response until my rebuttal, if that's appropriate. In fact, yes, this information is protected by the attorney-client privilege, and GSK had plenty of opportunity, and, in fact, they did exercise their opportunity specifically at depositions to ask these petitioners all of this information. Whether they did it verbatim from this questionnaire or not, I can't tell you, Your Honor. Your argument is that that cuts against them, not in favor of them. Excuse me? I think you want to say yes. Yes. Your argument is that what Justice Kleinfeld just described, he's a very just man, what he just described, that is that they have had or will have legitimately access to this information through discovery, cuts against their position, not in favor of it. Yes, I do argue that. Thank you. Thank you, Counsel. May it please the Court, I'm Jim Miller, and I'm the lawyer for GlaxoSmithKline in this case. Judge Graber, if I may respond to your point, it is certainly true that in discovery, GlaxoSmithKline has inquired about the medical history of these four plaintiffs, but keep in mind And you want to see it again because? Excuse me, Judge, I couldn't hear you. You want to see the same information again in this form for what reason? Because the claims in this case are of unspecific, subjective medical conditions. There is no manifest injury here. The medical histories of these plaintiffs do not reflect the What does that have to do with why you need to see the forms that they filled out on the internet? Because as the district judge recognized, the credibility of these plaintiffs is a key issue in this case. But that doesn't help me any. In any case, I'd kind of like to know what my adversary told his lawyer before his lawyer woodshedded him. Unfortunately, I ordinarily can't find that out. I never find out what the opposing party told his lawyer before the lawyer prepared him for the deposition or trial testimony. And I never see the answers to interrogatories until they pass through the lawyer's office. So why is this any different? Well, this is different because the responses to this questionnaire as a district court held are not protected by the attorney-client privilege. Now let's get to that. And we're entitled to see them. The district court had one reason, which was two reasons, I think, that were clearly wrong. One is that the questionnaire doesn't form an attorney-client relationship. And another is that she thought there was a waiver of confidentiality. But it never says, I waive confidentiality. So she doesn't have those reasons. Now, I think there's another reason that is really at issue here. And that is, is this an application to be represented? Is this a client feeling out a lawyer for potential representation? Or isn't it? How can I tell? Judge Kleinfeld, I think you've put your finger on the key to this case. There's no question, as you've stated at the beginning of the argument, that under the initial consultation rule, communications to a lawyer from a person who's seeking legal representation are privileged, even if no representation actually results. There's no dispute about that rule. That rule does not apply in this case because these four people, at the time they submitted their responses, clearly were not seeking legal representation. My colleague, during his argument twice, said that these were people with specific claims. There's nothing in the record that supports that. In fact, if you'll look at the appendix at page 101, that's the deposition testimony of one of these plaintiffs, Jerry Marin. And she's asked about the questionnaire, and she said, I thought it was part of a class action, and if they needed me, call me. That was her deposition testimony about the questionnaire. That's not the testimony of someone who's seeking legal representation. I have a question that concerns me about your position, and that has to do specifically with California law. And the presumption that's established in Evidence Code Section 917A, that seems to put the burden squarely on your shoulders to defeat a privilege when it is claimed. And it has been claimed here. And there is now an attorney-client relationship with those who are claiming the privilege. What is the information that's in this record sufficient to carry your burden to establish that the communication was not confidential? Judge, I respectfully disagree that it's our burden. The relevant statute is Section 917A of the California Evidence Code. And that code does, as my colleague said, create a presumption that communications to a lawyer are confidential. Once it has been established that the communication was made in the course of that relationship. But doesn't that contradict what you just said, that there's no question about the fact that when someone initially consults a lawyer, maybe not having decided whether to hire them or not, that that also is swept in once they do hire that, or even if they don't hire that lawyer? Your Honor, my view would be that the burden is on them, under 917A, to show that the initial consultation rule applies here because these people were seeking legal advice. And let me just say that in our brief, both at page- Not the words in 917A. The thing that makes it operate is a claim of privilege. It says whenever a privilege is claimed on, and then it lists a bunch of different grounds, the communication is presumed to have been made in confidence, and the opponent has the burden. Judge, in our brief at page 1 and at page 12, we cite the Greene and Shinie case. And the court in that case squarely held that that section of the California Evidence Code puts the burden on them to show the existence of the relationship, and only then does this presumption come into play. Actually, that case was quite different, though. Didn't that case deal with records that had previously been public records, and then- Judge, I think you're correct about that. But the point of the case is that it's stating how this presumption works under California law. And I'm simply saying that the key issue of whether these people were seeking legal representation at the time, the burden is on them, not on us. But in any event, we're in federal court. And this court held on March 31st in the Burlington Northern case that to claim the privilege, it is not sufficient to make a boilerplate or blanket refusal to produce. That was a very different situation. That case involved a situation in which documents were claimed to be privileged, and there was foot-dragging on the part of the party that was supposed to be producing them, and game-playing. And the question was whether the district court had the authority to sanction to the extent of saying, you know, you've lost your privilege by this game-playing. And I don't see that in this record. Well, Your Honor, I think that, obviously, if you were on the panel and would know more about the case than I do, but I believe the issue dealt with by the panel was what does it take to assert the privilege in response to a Rule 34 request? You have not made the argument, though, in this case that was made in that case, which was that delay alone caused the loss of the privilege. That was the argument that was made in that case. And that's not the argument you've made here. As I understand it, your argument is these documents were never privileged because there wasn't a lawyer-client relationship, and that's different than delay. Judge, you're correct about that, but they have never submitted any evidence. There's no affidavit from any of these plaintiffs as to why they submitted the questionnaire. They have not submitted any evidence in support of their position. These responses to these questionnaires were never listed on any privilege log. Their response to our Rule 34 request is in the appendix. It's Exhibit H. And their claim of the privilege for these questionnaires is 17 words long. And I'm giving them the benefit of the doubt because they begin the sentence with a word further, and I'm including that. You obviously know the record quite well, Counsel. Let me ask you about a couple of things from the depositions. Andrew Barton says at page 81 of his deposition that his purpose in submitting the questionnaire was to, quote, get into the class action. Your Honor, I think that's correct. I don't remember that exact quotation, but you're obviously reading it. But let me say that whoever filled out any questionnaire concerning Paxil that you obtained online, then he says his wife filled it. We've apparently got a bunch of plaintiffs here whose wives use a computer, but they can't. And then his answer is, he asks if you're referring to Exhibit I, and then he says, to get into the class action. Kenneth Bornstein is asked at page 186 of his deposition, did you fill out a questionnaire for your attorneys on the website? Answer, yes, I did. Marin, as you accurately quoted, said, I answered the question on the website, thought it was part of a class action lawsuit, and if they needed me, call me. And then Maythaller says I would have filed the information for the class action lawsuit when I went to their website. Well, Your Honor, all of those deposition responses are completely consistent with people who just think they're responding to a survey, looking for information about the class. None of those deposition responses are the responses of someone who's saying, I was looking for a lawyer. I call your law office and make an appointment. I don't tell the person who schedules the appointment what it's about. That person doesn't ask. I show up at your office. There is a clipboard on the front desk at the receptionist area. It doesn't say what it's for. It contains exactly the same disclaimer, and I fill it out and I walk in and hand it to you and have a discussion with you. Is the contents of that clipboard that I filled out privileged? Judge, I think that the key to your hypothetical is what's said in that discussion. Assume a case where that's the entire content of the case. That's all we know, is that I called your office. I didn't say why I was coming. Appointment is scheduled. I fill out a form. It doesn't say on it what the purpose is. It does have this disclaimer. I walk into your office. I hand you this. We have a discussion. The contents of that discussion are unknown. It turns out you don't represent me after that, or you do. Is the contents of what I filled out on that clipboard privileged? Judge, I would say that that is a much closer case because there's a big difference between making an appointment to go see a lawyer and filling out a questionnaire on a website that says this questionnaire is seeking information about potential class members. I can buy a new Mercedes online. I don't have to go to the dealership to buy it. That's the world of computers. Judge, but let me say that the If I could afford a new Mercedes. Excuse me? If I could afford a new Mercedes. But, Judge, let me say that the key issue here, I think, is that the disclaimer on this website and the description of the questionnaire itself is just inconsistent with their claim that these people, at the time they responded to the questionnaire, were seeking legal representation. Ambiguous. You know, one of them, the woman who says if they wanted to contact me, they could call me, sounds like she thinks she's just giving information for a questionnaire. The other one who says my purpose was to get into the class action sounds like he's trying to sign up with a lawyer. Judge, I'm not sure I agree with that. I think that sounds to me like he wants to make sure he's in the class rather than opting out. It's not. It's just not. Let me ask you something a little different. Has the class been certified? Your Honor, the district judge has twice denied motions for class. So there is no class at this point? There is no class. Are you seeking all 10,000? I think there were 10,000 of these filled out on the Internet. Your Honor, I don't know how many there are. Are you seeking however many thousand there are or just the four for the four name plaintiffs? Well, Judge, I think at the moment we're seeking only these four name plaintiffs, but I think the ruling of this Court would clearly be absent some different circumstances that arose with different plaintiffs. You want all 10,000? I'm sorry, Judge? You want all 10,000? Well... Or you hope we rule your way and then you're going to go after all 10,000? If you rule in our favor, I think we'll take the position that absent some special circumstances, none of the responses to these questionnaires are privileged. But I can't speak to the circumstances. I'm thinking we know, at least on my reading, I realize you can argue this, we know that of the four, one of them really thought he was trying to hire a lawyer and one of them sounds like she wasn't. Of the 10,000, if it's like these four, there's going to be perhaps similar ambiguity except we won't have any depositions where they say what they thought they were trying to do. Well, Judge, we might or we might not have depositions. Are you... I had thought initially when I got this case that you were trying to get the 10,000 and that you were going to give them to a professor to do some kind of statistical examination and show a random relationship between claims of symptoms and using Paxil. But it sounds like, no, that's not it. You're trying to get the questionnaires of people who've answered the same questions for you to show that they gave different answers to their lawyers. And, Judge, that makes perfect sense. These statements on the questionnaire, either by the person who took this drug or by one of their loved ones, are the most contemporaneous statements we have. Sure. In many cases... Sure, but that has nothing to do with whether they're confidential. Judge, you're correct. It has nothing to do with whether they're subject to the attorney-client privilege, but it does go to answer Judge Graber's question as to why... The guy can come into a lawyer's office and say, I actually committed the murder that I'm charged with. And then he can get on the witness stand and lie. And the lawyer does have various precautions he's required to take under... What was it? Nixon or something? A Supreme Court decision about that case. But he cannot get on the stand and testify, my client told me that he committed the murder. Your Honor, you're exactly right. And the reason you're right is because of the initial consultation rule. And the question for this Court is, does that rule apply to these responses? And I'm simply saying that there's no evidence in this record that any of these four people, or Mr. Barton's wife, were seeking legal representation at the time they filled out the questionnaire. And the statements on the questionnaire and in the disclaimer are flatly inconsistent with that claim. The statement... How do you know that? Judge, I'm sorry, I couldn't hear you. How do you know that? Because to submit the responses, they had to check the box, as you pointed out, saying, I'm not seeking legal representation. It doesn't say that. It doesn't say representation, it says legal advice. Legal advice. I'm not seeking legal advice. I heard my colleague try to draw a distinction between those two things, and I just don't see a distinction. Could you ever suggest to the district court that it or a master examine the questionnaires to determine whether there was... Judge, we did not make that suggestion. And let me emphasize that I think that under 917A, I think the case law in California is clear that the burden is on them to show the facts that support application of the initial consultation rule. If I may, you know, there's one very interesting part of this case, and that's the declaration that my colleague, Ms. Menzies, submitted with the application for mandamus. You'll recall that in that declaration, she surveyed the websites of 27 law firms, including incidentally my law firm, and what she found is she doesn't really say this in her declaration, but what's very interesting to me is that nine of the law firms she surveyed warned visitors to the website, don't send us information because it won't be privileged. That's one third of the firms. One firm, Leaf Cabraser, here in San Francisco, is at the other side and says, we promise you that any information you send us, we will protect as best we can under the law. I have another question for you. Even though there is the disclaimer, I agree that the above does not constitute a request for legal advice, it would seem to me that other parts of the questionnaire are already giving legal advice. Things like, please don't send us your medical records. You may have received from GSK a request to sign an authorization for release of medical records. We suggest you don't sign it. And it explains why, and it tells them what files to keep, what kinds of documents to keep. Is that a form of legal advice that they're already giving to these individuals? Judge Graber, I think that what the disclaimer would say, what the disclaimer says about those statements is that  it's general information, close quote, and not legal advice. So it may look like legal advice, but according to the disclaimer... Well, I'm asking a subtly different question, because the disclaimer says, any information I receive in response to this questionnaire is general information. Okay? But what I'm saying is, forget about responding to the questionnaire. Does the questionnaire itself already give legal advice, past tense, to the people who are filling it out? I think, Judge, that those statements on the questionnaire have to be treated like the general statements that appear on any law firm's websites about the nature of its practice and what it does. But let me point something out. Something that's totally absent from this disclaimer and the questionnaire is any statement to these people, go talk to a lawyer. There's no statement like that anywhere in this questionnaire or in the disclaimer. And as far as the record shows, it's totally absent. That's interesting, because going back to Ms. Minzey's declaration, of the firms she surveyed, including my own, 15 of them, more than half, have a statement that says, go talk to a lawyer. This website doesn't say that. And that's why... Maybe because they think they've already had people talking to a lawyer. Well, Judge, that's true of any law firm website. If people are going to it, they're obviously viewing what a law firm does. But most law firms, a majority, as shown in this declaration, tell those people, you need to talk to a lawyer. That's not stated on this website. And I raise that because I think it goes to this question of seeking legal representation. This website really is almost designed to make people think that all they're doing is collecting information about a class action. And that doesn't make this response privileged. Thank you. I'd like to respond to just a few points. First, I want to bring back this whole legal representation discussion to the client's perspective and how the lay perspective... How come no affidavits from the client saying, I thought I was trying to hire a lawyer? It wasn't necessary, Your Honor. There's a presumption of confidentiality. When these petitioners submitted their personal medical information... It would have been so easy. If I had four affidavits sitting here in my excerpt saying, I thought I was trying to hire a lawyer, that's why I gave them all this secret information about my medical stuff. Case over. Well, quite honestly, Your Honor, the district court found that, in fact, they were seeking legal representation. And until they wrote their opposition, we viewed it as sort of an open and shut case. They were sending their personal medical information to attorneys... They didn't know any more than we do, right? Well, I mean, we know a lot more about our clients than you do, Your Honor. But regarding this particular... I say the district judge. That's correct. That's correct. You have the entire record from the district court. Well, the thing that makes this hard is it's kind of cute. It says... It gives legal advice, like, don't cooperate with the drug company. And then it says, basically, but you can't sue us if we're wrong. It won't take responsibility for it. It says... I agree that local counsel may be contacted, which I suppose means a disclosure. And it says... It doesn't say the purpose of this questionnaire is an intake questionnaire for the potential clients of our firm. It doesn't say, if you want to be represented by our firm, fill out the questionnaire. It says the purpose is to gather information about potential class members. It doesn't say potential class members represented by us. For all I could tell from that, this law firm is just doing a public interest thing to examine class actions about drugs. It's kind of cute. Judge Kleinfeld, I think there's an important point to be made here. And this arose in the context, I think, of Judge Hawkins' questions regarding what these petitioners thought they were doing when they submitted this information. Before I went to law school, I didn't know the difference between a mass tort and a class action and a personal injury action. I thought they were all just legal actions. These petitioners stated at their depositions, and in fact this questionnaire buttresses the point that in fact they knew there was pending litigation that we called a class action, but I don't think any of these petitioners have any legal training and would know the difference between what a class action is and a mass tort. What that shows is that, in fact, these petitioners were seeking legal representation of some sort. I don't think it's important that it has to be defined the specific type of legal representation they were seeking. I think it's a general analysis from the client's perspective, from a lay person's perspective. It doesn't say that they're seeking legal representation? It doesn't say that they're not seeking or seeking legal representation anywhere in the questionnaire, Your Honor. I think that that's judged by the circumstances of what occurred here. These were people with a specific claim against a specific defendant who sent seven pages of personal medical information for which they clearly didn't want to be broadcast all over the world, which would be the effect of this district court's order here. Information about suicide attempts, mental health history, and miscarriages would be open for the public to see if this order were to stand. There's no way when they submitted this information to these attorneys, our law firm, that they thought that that would occur. Let me ask this question. You now represent these four individuals? There's five, but there's four at issue with this... Four at issue in this litigation that are presently clients of your firm. That's correct, Judge Hawkins. You've asserted the attorney-client privilege as to this information. Consistently. You've made the claim of privilege on their behalf. Correct. Thank you. Thank you, counsel. You mean the one that rolled to the bottom? Yeah. Let's see. That was Barton v. U.S. District Court, and we passed one up, and we're coming back to it. Sumiati v. Gonzales. And, counsel, I noticed that you were coming in the courtroom literally as we passed your case. There's no need to make any kind of apologies or not. We know you were here. Thank you, Judge. I appreciate that very much. I thought there were two cases in front of me. I used the facility as an example. I was mortified. Don't worry about it at all. Thank you. I very much appreciate your understanding. Your Honors, may it please the Court. I'm Robert G. Ryan for the petitioners. I guess you can just say, lo-long, lo-long, lo-long. Yes, Your Honor. Are all Chinese, Christian, female Indonesians entitled to asylum in the United States? Judge Kleinfeld, I believe there has to be perhaps some showing of particularized risk. Lo-long... Lo-long, she was a student in the U.S. It's very broad, and I think... I don't think she'd even been back there much except for vacation trips, actually. I guess I'm answering this question very conservatively in the sense that lo-long would seem to indicate that one could simply be a member of those particular disfavored subgroups and receive asylum. An immigration specialist could simply hang out a sign saying I represent only Chinese, Christian women from Indonesia and make a heck of a living. Well, Judge Hawkins, I think that one could draw the conclusion from that particular decision. We do have evidence here, personal experiences that do go to the protected grounds of ethnicity. In the absence of the lo-long case, though, would we be obliged to conclude that what happened to the petitioner was so bad that it rose to...
judges: Kleinfeld, Hawkins, Graber